# United States District Court

## NORTHERN DISTRICT OF GEORGIA

FILED IN CLERK'S OFFICE
U.S.D.C.  Gainesville

NOV 0 1 2011

JAMES N. HATTEN, Clerk
By_____
Deputy Clerk

UNITED STATES OF AMERICA

v.

SAMUEL J. CRUMP

**CRIMINAL COMPLAINT**

CASE NUMBER: 2:11-MJ-103

**(UNDER SEAL)**

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning on a date unknown, but at least as of September 2011, and continuing up to and including November, 2011, in Stephens County, Georgia and elsewhere, in the Northern District of Georgia defendant did,

aided and abetted by Ray H. Adams and others, knowingly attempt to develop, produce, and possess a biological agent and toxin, to wit: ricin, for use as a weapon

in violation of Title <u>18</u> United States Code, Sections <u>175(a) and 2</u>.

I further state that I am a Special Agent of Federal Bureau of Investigation and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof.          (X) Yes          ( ) No

_____
Signature of Complainant
David W. Wylie

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it.  Sworn to before me, and subscribed in my presence

<u>November 1, 2011</u>          at     <u>Gainesville, Georgia</u>
Date                                           City and State

SUSAN S. COLE
<u>United States Magistrate Judge</u>          _____
Name and Title of Judicial Officer          Signature of Judicial Officer
AUSA Jeffrey A. Brown

**AFFIDAVIT**

I, David Wylie, being first duly sworn, do hereby depose and State:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for approximately twenty - five years. I am currently assigned to the FBI's office in Gainesville, Georgia. My investigative responsibility includes investigating different federal crimes such as bank robbery, bank fraud, mortgage fraud and domestic terrorism. I have been involved in investigations relating to domestic terrorism and have participated in the execution of search warrants and seized evidence that relates to violations of domestic terrorism statutes. I know the following principally based on information obtained from my investigation and from other law enforcement officers.

2. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3. This affidavit is in support of a request for a federal search warrant to be served upon and executed at the residence of Samuel Jerry CRUMP, 111 Woodlawn Drive, Toccoa Georgia 30577 is a single story family residence single wide mobile home with

1

no basement located within Stephens County.  The exterior is white siding with an enclosed addition attached to the front of the home which appears to be the main entrance off the driveway. The property consists of .27 acres which includes the main residence.  The property is recorded on the Stephens County tax map as parcel number T34 068; to search for evidence, contraband and fruits of a crime as set forth in Exhibit B (attached hereunto and expressly incorporated herein by this reference), as well as any vehicles located on the property and any out buildings located on the properties.  I am also requesting authority to search the referenced properties and any computers, and computer media located therein where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of a violation of Title 18, United States Code Section 175, prohibitions with respect to biological weapons.

4.   This affidavit is also being submitted for the purpose of securing a complaint and warrant for the arrest of Samuel Jerry CRUMP (CRUMP) for aiding and abetting Ray H. Adams in the knowing attempt to produce and possess the biological toxin, ricin, for use as a weapon in violation of Title 18, United State Code, Sections 175(a) and 2.  I have not included each and every known fact concerning this investigation; rather, I have

2

set forth only the facts believed necessary to establish probable cause for the issuance of the requested search warrant, complaint and arrest warrant. However, even though I have not included every fact known to date in this investigation, I do not believe anything has been omitted which would vitiate the probable cause set forth herein.

5.    Ricin is a toxin as defined in Title 18, United States Code, Section 178(2) and is extracted from the seeds of the castor bean plant, Ricinus communis. Castor beans are used for food and agriculture, textile chemicals, paper, perfumes, cosmetics and pharmaceuticals. The materials needed to manufacture ricin are easy to acquire and the process of extracting it from castor beans requires no technical expertise. Ricin is manufactured using castor beans, acetone and lye. Recipes for making ricin are readily available on the internet and books on unconventional weapons. Ricin can be employed in either a powder or liquid form and has been used in assassinations or small contamination events. Ricin powder at the production site can pose an inhalation hazard for first responders.

## BACKGROUND OF THE INVESTIGATION

6.    On 03/17/2011, a confidential human source (CHS1) consensually recorded a clandestine meeting involving members of

3

a fringe group of a known militia organization, with the fringe group calling itself the "covert group." The meeting occurred at the residence of Frederick W. Thomas (THOMAS), and attendees at the meeting included THOMAS, Emory Dan Roberts (ROBERTS), and others.   During the meeting, ROBERTS said he knew people in Habersham County [Georgia] who had a substance that could kill people with a very small amount. CHS1 suggested he was talking about ricin, and someone else agreed, adding that ricin is made from castor beans. The conversation then went into a discussion about castor beans and possible ways to obtain them.

7.   On 04/16/2011, CHS1 consensually recorded a meeting at the residence of THOMAS that included THOMAS, ROBERTS, Ray Adams (ADAMS), and others.   During the meeting, THOMAS talked about the need to take action against the federal government, to include assassinating government officials.   THOMAS later asked if the other members were "committed to taking action" against the government, and ADAMS stated, "I am."   ADAMS also made the following statements during the meeting:

a.   "I'd say the first ones that need to die is the ones in the government buildings."

b.   "When it comes down to it, I can kill somebody."

c.   "Let me say it now, y'all are welcome to use my property at anytime."

4

8.    On 05/17/2011, CHS1 met with THOMAS and ROBERTS.   (This meeting was not recorded.)   During the meeting, ROBERTS mentioned he had recently been talking to a former U.S. Army soldier in Stephens County [Georgia], described as a "loose cannon", who has manufactured ricin.   ROBERTS said that he had personally seen the ricin in powder form.

9.    On 06/24/2011, CHS1 consensually recorded a meeting with THOMAS and ROBERTS.   ROBERTS stated that someone named Sammy may have access to beans that are used to make ricin.   ROBERTS stated, "He has some of the beans."   ROBERTS also said that Sammy was upset the war with the government had not already started.

10.    On 08/09/2011, an Undercover Employee (UCE) made a consensually recorded telephone call to THOMAS.   During the call, THOMAS stated that one of the people he was associating with had the type of beans needed to make ricin.

11.    On 09/17/2011, CHS1 consensually recorded a meeting with ROBERTS at a Waffle House in Toccoa, Georgia.   ROBERTS and CHS1 drove separately to the residence of ADAMS located at 558 Lakeside Road, Toccoa, Georgia. Samuel CRUMP arrived about 1 1/2 hours later.   ADAMS told everyone he was a retired United States Department of Agriculture employee.   ADAMS showed the others plaques from his career regarding his certifications and training and advised that he had worked in the horticulture field.

5

12. When ROBERTS and ADAMS walked off, CHS1 asked CRUMP about a Center for Disease Control email address from one of CRUMP's previous e-mails to CHS1. CRUMP advised he previously had worked at the CDC and that he knew people everywhere. CHS1 then said to CRUMP, "The stuff that, um, Dan (ROBERTS) said you can make (reference to ricin), you still make that?" CRUMP replied, "Yea." The following conversation then occurred:

CRUMP: "What I'd like to do is make, uh, about 10 pounds of that (reference to ricin). Give you 2, me 2, Ray (ADAMS) 2, Dan (ROBERTS) 2, and somebody else 2. Put it out in different cities at the same time: Washington, DC; maybe Newark, NJ; Atlanta, GA; Jacksonville, FL; New Orleans. Dump that little (unintelligible) that's all ya gotta do is lay it in the damn road, the cars are gonna spread it."

CHS: "Yea, but what's it take to make it? I haven't got a clue."

CRUMP: "Just some seed. I got the, uh, got one more ingredient, and I'll get it today. (Unintelligible) you be here when we make it. Ray's (ADAMS) gonna make it."

13. CRUMP also made the following statements to CHS1 regarding the material (ricin):

a. "Ya got, ya can't let none of it get on your skin. Got to be a closed environment when it's made. No wind. If it gets

6

up your nose . . . there's no cure."

b.  "You got to know where the wind's comin' from.  You can't be (unintelligible) yonder and go down wind.  That shit's gonna follow ya."

14.  CRUMP also told CHS1 about another substance even deadlier, stating "That other kind, 1 pound can kill 30 million people."  CRUMP then stated, "We need somebody to back us with some damn money so we can make that other shit," which he then described as, "This is worse than anthrax."  CRUMP added, "That shit's deadly!  There ain't no damn, there ain't no cure for it either.  And it works, I think within 2 hours."

15.  CRUMP then suggested a scenario for dispersing ricin in the Atlanta area, telling CHS1 the following:  "Ya get on the trunk of Atlanta, you get up on the north side, ya get on 41, ya throw it out there right on 285, ya go up 41 or 75, go up 75 to get away from it.  Keep the heater on, that way it keeps the pressure out.  Don't roll your window down."

16.  CRUMP eventually called ADAMS over and the following conversation occurred:

CRUMP:  "What's the name of that worst poison, Ray?"

ADAMS:  "Ricin."

CRUMP:  "No, the other one."

ADAMS:  "What other one?"

7

CRUMP: "Kills about 30 million people at one time, about a pound of it. It's caused from dead food."

ADAMS: "Oh, botulism."

17. On 09/19/2011, the Centers for Disease Control (CDC) advised that CRUMP worked at the CDC in the past for a contractor doing "maintenance type services" at CDC.

18. On 09/29/2011, the United States Department of Agriculture (USDA) verified that ADAMS used to work for a USDA agency called the Agricultural Research Service as a lab technician.

19. On 10/01/11 CHS1, CHS1 consensually recorded a meeting at ADAMS' residence located at 558 Lakeside Road, Toccoa, Georgia. Attendees included THOMAS, ROBERTS, ADAMS, and others. CHS1 reported that ADAMS gave meeting participants a tour of his living quarters. CHS1 described the living quarters as a cabin that included living and eating areas and a travel trailer behind the main cabin. CHS1 also reported that there were two other out buildings that appeared to be car ports that were enclosed on three sides. During the tour of the living quarters CHS1 observed laboratory equipment on the mantle in the main living area, and described the equipment as having a metal pole on a stand with several arms extending from the center, attached to three of the arms was a condensing coil, y-clamp and funnel with

8

a spigot.

20.    On 10/06/2011 CHS1 consensually recorded a meeting with CRUMP and asked about his plans to make and or use ricin.    CRUMP told CHS1, "I'll bring ya some seed (reference to castor beans)," and then explained that the items needed to make ricin are castor beans, acetone, lye, and a mixer.    CRUMP also explained that when searching  for  or  purchasing  materials  to  make  this  substance (ricin), a person should buy the materials at different locations and away from where the person lives.    CRUMP also warned against searching  for  or  purchasing  such  materials  over  the  internet because it could be tracked.    CRUMP made the following additional comments regarding making ricin:

a:    "Can't find the Red Devil lye to put in it.    It takes lye."

b.    "Gotta have acetone, a mixer."

c.    "But ya gotta get it (acetone) in the can.    I can buy quarts at Tractor Supply."

d.    "When ya soak it (castor bean), that lye takes the hull off the seeds.    Then ya take the seeds up (unintelligible).    Then one ounce of seed to 2 ½ maybe 3 ounces of acetone.    All that acetone is is your drying compound.    Once you put in a blender, keep blendin' it up, it's gonna come out like baby powder.    But now ya gotta be careful of that shit."

9

e.   "It's (ricin) gotta be put in a jar after it comes out of the blender.  Ya can't handle that shit with your bare hands. Ya got to have gloves."

f.   "There's no cure for it (ricin) once it gets into your lungs.  You're gone.  You can kiss it goodbye.

g.   "If it (ricin) gets on your skin, it soaks into your skin, you're gone.  This damn stuff is dangerous."

h.   "If you're gonna do this (unintelligible), it's gotta be built, a hood.  There can be no air, can't be no disturbance."

i.   "I can get ya seed (castor beans).  I know where the seeds is at right now."

j.   "We gonna build us a hood."

k.   "It's gonna be in a building in a controlled atmosphere. We'll have a (exhaust) fan."

21.   CRUMP also made the following comments regarding dispersing ricin:

a.   "You take a pound of that (unintelligible), get upwind, up around Washington, DC, get about 20,000 feet (in an airplane), and turn that shit loose, it'd cover the whole (unintelligible) of Washington."

b.   "That stuff's gotta be, charcoal put in it, turn it black so it can't be detected, and it's gonna be white when it comes out, and if you got a way to release it up under your car,

10

that stuff blows out, cameras gonna pick it up . . . If it's black, it's gonna be hard as hell to detect."

c. "Ya get behind a damn, or beside a tractor and trailer, pull your string, open up your lid, it comes out the back. Gotta make sure your heater's on in your car, full blast."

d. "But if we's on the upper end (Washington, DC beltway), the wind's blowin' that way, start puttin' it out, come on around, go around, and that's still blowin' that way."

e. "Halfway ya got a pipe comin' out of the exhaust . . . be like dual exhaust on a damn vehicle; they'd never know it."

f. "Run another pipe from inside the back seat, throw that stuff in there, get where you're goin', just have, uh, something where you can release it down that tube right out the back."

g. "Just think, put all that shit out, and it starts goin' towards Washington, peoples starts kicking the bucket like that, you're talking about a red flag buddy."

22. CRUMP also made the following comments about how to act if they did make ricin:

a. "Everything that's been made around it would have to be destroyed before ya even start."

b. "If you don't admit nothin' they can't prove (unintelligible), but if they find that shit on your computer, you're hung."

11

c.    "If you got anything on that computer that you been huntin', they take that hard drive out."

d.    "But ya gotta get rid of it.  Ya know, I'm just tellin' ya all that in case we do get started, I'm ready for it."

e.    "Just say, me and you went ahead got hold of some of that (ricin), we went and put it out, we ain't got no friends."

23.    CRUMP also made the following comments about botulism, suggesting to CHS1 that if they could get the financial backing, they could go to Africa and acquire the material to make botulism:

a.    "Well, I thought you can't make that botulism (unintelligible) got some good backers (unintelligible) go to Africa and, uh, get some of that to make."

b.    "We'd bring it back over here.  Ya don't make it over there. You just get the samples of the stuff out of the soil.  It comes from, um, it comes from dead animals, rotten meat.  That's where botulism comes from.    It's more potent than the stuff (ricin)

.  .  .  I know somebody can make it."

24.    On 10/15/2011, CHS1 consensually recorded a meeting at ADAMS' residence located at 558 Lakeside Road, Toccoa, Georgia. Attendees included THOMAS, ROBERTS, CRUMP, ADAMS, and others. CHS1 reported that ADAMS gave meeting participants a tour of his

12

living quarters and CHS1 observed laboratory equipment, specifically a glass beaker in the main residence, during the tour.   Also CHS1 reported that ADAMS showed meeting participants plaques and awards from his employment with the United States Department of Agriculture.   During that meeting, CHS1 observed ADAMS take a bean from a storage container located in a car port type structure outside ADAMS house.   ADAMS gave the bean to CRUMP who in turn gave the bean to CHS1.   CRUMP indicated that the bean was a castor bean.   CHS1 described the storage container as approximately 2 feet by 1 ½ feet by 10 inches, and as being about ¾ full of the beans.   Also during the meeting, the following conversation occurred between CHS1 and CRUMP:

CHS1: "When ya wanna do it?"

CRUMP: "Oh, we gonna do it. 'Bout you?"

CHS1 "Oh no, not me."

CRUMP: "Well now. (unintelligible)

CHS1 "Let me know if ya need me to get anything."

CRUMP: (unintelligible) "Gotta build a hood."

CHS1: "Okay."

CRUMP: "Uh, and a filter up here with a blower in it to pull everything out, cause everything gotta go through the opening on the hood, gotta come out this way."

CHS1: "Yea, okay."

13

CRUMP: "Gotta have gloves all the way up to here, a mask."
The following conversation also occurred at the meeting:

CRUMP: "It's extremely dangerous."

CHS1: "Okay."

CRUMP: "I wouldn't do it by myself, but they the one's that know how to do it.  When we get ready to do it, I'll holler at ya."

Also during the meeting, ADAMS made the following statements to CHS1:

ADAMS: "Well I've never done it (made ricin), but I have laboratory experience, and once you extract that stuff enough, just splashin it on your skin can kill ya."

ADAMS:  "Once it dries(UI), while it's wet, any kind of solvent like, anything, it just takes water solution to soak through your skin. It's highly permeable through the skin. There's no antidote."

ADAMS:  "I've handled all kinds of deadly stuff, pesticides and that kind of stuff, so . . .."

25.  On 10/20/2011, the Georgia Public Health Laboratory reported that the bean provided to CHS1 by ADAMS and CRUMP was verified to be a castor bean by a DNA test, and the bean tested positive for ricin.

14

26.  On October 22, 2011, CHS1 consensually recorded a telephone call with CRUMP.  During the call CRUMP told CHS1 that he was using his laptop computer on the internet at a restaurant. On October 25, 2011, the CHS1 communicated with CRUMP using the e-mail address samuelcrump3@gmail.com about contacting ADAMS.

27.  On October 29, 2011, CHS1 reported to agents that he met with CRUMP and others.  During the meeting, CRUMP told the CHS1 that he was going to shell his beans at his house this week. CHS1 told CRUMP that he would be able to get pure sodium hydroxide (Lye); CRUMP said that was good, but still wanted CHS1 to find Red Devil lye if possible.

28.  On October 29, 2011, CHS1 reported to agents his meeting with ADAMS at ADAMS's residence located at 558 Lakeside Road, Toccoa, Georgia, 30577.  During the meeting, CHS1 told ADAMS that he spoke with CRUMP about sodium hydroxide (lye). ADAMS told CHS1 how to use lye to remove the bean (castor bean) shell. ADAMS also told CHS1 that the shell did not need to be removed and that grinding them whole increased quantity of ground up bean.  CHS1 observed ADAMS reach under his desk in the main residence and remove a metal cash box that contained personal papers. CHS1 observed ADAMS remove two pieces of paper. The first piece of paper contained a list of various poisons, descriptions and effects.  The first poison listed was botulism.   The other

15

paper contained a detailed recipe for making ricin and the top of the paper contained the words "you make this and you die in four days." CHS1 told ADAMs that he had found a source for the sodium hydroxide (lye) and would be willing to purchase the chemical. ADAMS stated that he needed a pound of lye and that he planned on making his own lye by leaching it from wood ashes to make his ricin.

29. When CRUMP has driven to the various meetings described in this affidavit, he has driven to and from the meetings using one of the following two vehicles:

a. 2004 Honda Motorcycle, license plate Georgia YC89GP, which is registered to him at his residence located at 111 Woodlawn Drive, Toccoa, Georgia; and

b. 2003 Ford Pickup Truck, license plate Georgia BW5U73, which is registered to Greg Harold Bond at 1884 Athens Road, Royston, Georgia. CRUMP identified Bond as his son-in-law.

30. CRUMP has maintained contact with the other group members through use of his cellular telephone.

### Reliability of the Source of Information

31. During the course of the investigation of ROBERTS, THOMAS and others affiliated with the covert group, the FBI as utilized to confidential human sources. The credibility of CHS1 has been demonstrated by the sources' accurate recounting of the

16

conversations the source recorded during meetings with CRUMP, ADAMS and others, when compared to the audio and video recordings of the meetings and physical surveillance of those meetings conducted by law enforcement agents. Law enforcement agents assisting with the instant investigation have listened to and/or viewed consensually recorded telephone calls and video recordings.

32. CHS1 is currently on bond for pending felony state charges. The FBI administered a polygraph test to CHS1 during the investigation of a militia group. The FBI polygrapher determined that CHS1 gave less than truthful responses concerning the activities of the militia group.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

33. As described in Attachment B of search warrant and application, the requested search warrant seeks permission to search for records that might be found on the properties listed in paragraph 3, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

34.  I submit that if a computer or storage medium is found on the properties listed in paragraph 3, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.  Based on my knowledge, training, and experience and consultation with FBI forensic computer experts, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer

18

storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.   To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.   However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

35.  Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the PREMISES because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been

deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.   Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.   Forensic evidence on a computer or storage medium can also indicate  who has used or controlled the computer or storage medium.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or

20

storage medium at a relevant time.

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

36.  Necessity of seizing or copying entire computers or

21

storage media. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of

22

data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

37. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its

later examination consistent with the warrant.  The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### CONCLUSION

38.  Based on the aforementioned factual information, your affiant respectfully submits that that there is probable cause to believe that there is now concealed evidence, as described in detail in Attachment B, of evidence of the commission of criminal offenses, namely, violation of Title 18 United States Code Section 175, Prohibitions with respect to biological weapons is located in the residences more fully described in paragraph 3, and this evidence, listed in Attachment B to this affidavit, which is incorporated herein by reference, is contraband, the fruits of crime, or things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

39.  Based on the aforementioned factual information, your affiant also respectfully submits that there is probable cause to believe that CRUMP and ADAMS aided and abetted each other in the knowing attempt to produce and possess the biological toxin, ricin, for use as a weapon in violation of Title 18, United State

Code, Sections 175(a) and 2.

40. Finally, because of the ongoing nature of the investigation, and to ensure the safety of the confidential source and law enforcement officers involved, I request that the search warrant, application, complaint, arrest warrant and affidavit in support thereof, be SEALED until further order of this Court.